UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

MILTON SAMUELS,

                              Defendant.

No. 08-cr-789 (RJS)
ORDER

RICHARD J. SULLIVAN, Circuit Judge:

On October 1, 2020, the government filed a memorandum opposing Defendant Milton Samuels's request for a reduction of sentence and compassionate release under the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A).  (Doc. No. 436.)  The government has attached a redacted exhibit to that memorandum and provided the Court with the unredacted version of that exhibit, which is comprised of Defendant's medical records.  The government requests that the unredacted version of this exhibit be filed under seal.  The Court has reviewed this private medical information and concluded that the presumption in favor of open records is outweighed by Defendant's privacy interest.  *See United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995).  Accordingly, IT IS HEREBY ORDERED THAT the unredacted version of Exhibit 2 to the government's memorandum shall be filed under seal.

Separately, the Court has reviewed Defendant's papers (Doc. No. 434) and concluded that the medical records accompanying that motion should also be filed under seal, as the presumption in favor of open records is outweighed by Defendant's privacy interest.  *See Amodeo*, 71 F.3d at 1051.  Accordingly, the Court respectfully requests that the Clerk of Court seal the unredacted

attachments that currently appear on the public docket at Doc. No. 434 and replace them on the

public docket with the redacted versions attached hereto.

SO ORDERED.

Dated:        October 2, 2020
              New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

vs.                                                Crim. No. 1:08cr789

MILTON SAMUELS,

     Defendant.

_____/

## MOTION FOR COMPASSIONATE RELEASE AND REDUCTION OF SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A) DUE TO COVID 19 PANDEMIC

COMES NOW, Milton Samuels, ("Samuels") pursuant to Title 18 U.S.C. § 3582(c)(1)(A)(i), § 1B1.13 of the US Sentencing Guidelines and 28 CFR Section 571.61 and seeks this Court to grant him compassionate release  from FCI Fort Dix to time served.  In support of this request, Samuels provides as follows:

### INTRODUCTION

After a jury trial, Samuels was convicted of conspiracy to distribute cocaine, Title 21 U.S.C. § 846 (Count One) and use and carry a firearm in relation to a drug trafficking crime, Title 18 U.S.C. § 924(c) (Count Two). (Dkt. 159).  The court sentenced Samuels to 276 aggregate sentence for both counts. (Dkt. 159).[1]  Direct

---

[1] In light of *United States v. Williams*, 558 F.3d 166 (2nd Cir. 2009). the court did not impose a sentence on the § 924(c) count.

appeal was affirmed, *United States v. Sanchez*, 419 F. App'x 27 (2d Cir. 2011) and a writ of certiorari was also denied. *Samuels v. United States*, 565 U.S. 884, 132 S. Ct. 256 (2011). Samuels is currently serving his term of incarceration at FCI Fort Dix with a tentative release date of May 28, 2028. In light of the coronavirus, Samuels is requesting a release in order to avoid further medical complications in light of COVID-19.

## LEGAL STANDARD

Under 18 USC § 3582(c)(1)(A)(i) a Court may modify a term of imprisonment "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment ... after considering the factors outlined in section 3553(a) to the extent that they are applicable, if it finds that— (i) extraordinary and compelling reasons warrant such a reduction." 18 USC § 3582(c)(1)(A)(i). The Sentencing Commission has issued a policy statement addressing reductions of sentence under § 3582(c)(2)(A), which is found at USSG § 1B1.13. Under that guideline provision, in addition to the above findings and considerations, the court must "determine[] that . . . [t]he defendant is not a danger to the safety of any other

2

person or the community, as provided in 18 U.S.C. § 3142(g)" before granting compassionate release.

### I. Samuels's Exhaustion of Remedies

Samuels has requested a compassionate release from the Warden at FCI Fort Dix on May 29, 2020.  The Warden denied and did not join Samuels's request to grant his motion.  Thus, Samuels has exhausted his required administrative remedies. (See Exhibit A).  See, *United States v. Kranz*, 2020 U.S. Dist. LEXIS 88623, at *6 (S.D. Fla. May 20, 2020) (upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.)

### II. If no action is taken the outcome could be devastating.

Samuels is an inmate whose compassionate release is appropriate. Coronavirus is known to cause serious health complications, worse for pre-existing conditions. A coronavirus exposure is the equivalent of a death sentence that this Court did not impose.  If he is not released from custody before the virus runs rampant at his jail, it will place him at risk of contracting the disease and suffering serious health complications, or worse. Contracting the coronavirus in prison could be a death sentence for Samuels.  Should Samuels be left in the facility, he will

3

remain in a vulnerable situation. As of today, there are approximately 29,284,484 worldwide confirmed cases with 929,999 deaths. In New Jersey, where Samuels is serving his sentence, there are 200,991 confirmed cases and 16,166 resulting deaths. The threat of COVID-19 is equally pervasive within the BOP facilities, with at least 13,351 inmates and 1,673 staff members testing positive for COVID-19. There are at least 118 reported deaths of federal inmates and 2 staff.[2] At FCI Fort Dix, where Samuels is housed, there are 42 cases of COVID-19 and there is no significant testing for COVID-19.[3] At FCI Fort Dix, only 457 tests have been performed where over 2,389 inmates are housed.[4] Only 19 % of the FCI Fort Dix' population has been tested. Unfortunately, this number will grow. Given the growing number of cases in New Jersey and increasing challenges in testing inmates and staff potentially exposed to COVID-19, it is only a matter of time before the infection spreads to further to staff and inmates. At that time, it may be too late to prevent Samuels from contracting the potentially deadly virus. As of

---

[2] https://www.bop.gov/coronavirus/

[3] Due to the rapidly evolving nature of this public health crisis, the BOP will update the open COVID-19 confirmed positive test numbers and the number of COVID-19 related deaths daily at 3:00 p.m. The positive test numbers are based on the most recently available *confirmed lab results* involving open cases from across the agency as reported by the BOP's Office of Occupational Health and Safety. BOP field sites may report additional updates throughout the day. Data is subject to change based on additional reporting. (https://www.bop.gov/coronavirus/).

[4] https://www.bop.gov/about/statistics/population_statistics.jsp

July 6, 2020, "33 % of all BOP Facilities" are infected with COVID-19.[5]  The

coronavirus is a particular threat to prison populations because of the

circumstances of confinement and the inmates' proximity to each other.[6]  There is

no social distancing, no hand wash, and no prevention at all of the threat of

COVID-19.  Inmates are merely locked in their cells waiting for the exposure to

arrive. The effects of the coronavirus in the jails could be devastating.  COVID-19

is a particular threat to prison populations because of the circumstances of

confinement and the inmates' proximity to each other.  BOP wide, it is estimated

that more than 70% of all federal prisoners tested have tested positive for COVID-

19.[7]

### 1. Extraordinary Circumstances Exist

Application Note 1 of section 1B1.13 of the Sentencing Guidelines describes

"extraordinary and compelling reasons" for release as including certain medical

conditions, advanced age, certain family circumstances, or some "other" reason

"[a]s determined by the Director of the Bureau of Prisons" that may act "in

combination" with the medical condition of a defendant. *See* U.S.S.G. § 1B1.13,

---

[5] https://www.bop.gov/resources/news/20200417_dir_message.jsp

[6] https://www.businessinsider.com/trump-consider-coronavirus-executive-order-federal-prisons2020-3

[7] Source: https://www.wsj.com/articles/more-than-70-of-inmates-tested-in-federal-prisons-have-coronavirus-11588252023

Note 1.  The Note specifies that "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" constitutes an "extraordinary and compelling reason" justifying compassionate release. See U.S.S.G. § 1B1.13, Note 1(A)(ii)(I). Due to the conditions under which inmates live, they are at extreme risk of infection once COVID-19 breaches prison walls. Social distancing is difficult and sometimes impossible.  Asymptomatic transmission presents additional complications in controlling the spread.[8]  Given the realities of prison life, it is not necessarily clear than any individual is safer from the virus while incarcerated. "Courts around the country have recognized that the risk of COVID-19 to people held in jails and prisons 'is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected.'" *See, United States v. Williams*, 2020 WL 1751545, at *2 (N.D. Fla. Apr. 1, 2020) (quoting *Basank v. Decker*, --- F. Supp. 3d ---, 2020 WL 1481503, at *3 (S.D.N.Y.

---

[8] In recent testimony before the Senate Judiciary Committee, Bureau of Prisons Medical Director Dr. Jeffrey Allen commented that "[a]symptomatic transmission has caused particular challenges[.] It illustrates the infectivity of the disease and difficulty controlling it in correctional environments." Dave Minsky, Nearly All Inmates at Lompoc FCI Tested Positive for Coronavirus, Most Asymptomatic, LOMPOC REC. (June 5, 2020), https://lompocrecord.com/news/local/crime-and-courts/nearly-all-inmates-at-lompoc-fci-tested-positive-for-coronavirus-most-asymptomatic/article_f3fb06d7-f231-52b3-8f89-f21f11b73974.html.

6

March 26, 2020), and citing *United States v. Harris*, --- F. Supp. 3d ---, 2020 WL

1503444, at ¶ 7 (D.D.C. Mar. 27, 2020)); *United States v. Campagna*, 2020 WL

1489829, at *2 (S.D.N.Y. Mar. 27, 2020); *Castillo v. Barr,* 2020 WL 1502864, at

*2 (C.D. Cal. Mar. 27, 2020); *United States v. Kennedy*, 2020 WL 1493481, at *2-

3 (E.D. Mich. Mar. 27, 2020); *United States v. Garlock*, 2020 WL 1439980, at *1

(N.D. Cal. Mar. 25, 2020)).

### 2. Samuels's medical conditions warrant relief.

Samuels is currently on a cocktail of medication to deal with a prostate

issue, diabetes, and a heart condition: Terazosin [9] due to bladder complications,

Tamsulosin .04mg,[10] HIGH Glucose (pre-diabetes), Atorvastatin,[11]

Hydrochlorothiazide 25 MG.[12]  He suffers from urinary tract issues, hypertension,

Diabetes Type II, Dermatophytosis, and has retained metal fragments from being

shot. (Exhibit B, partial medications list)  All of his listed medical conditions

immunocompromised his system and make him prong to contracting COVID-19.

---

[9] Terazosin is used alone or with other drugs to treat high blood pressure (hypertension)
https://www.webmd.com/drugs/2/drug-1592/tamsulosin-oral/details

[10] Tamsulosin is used by men to treat the symptoms of an enlarged prostate (benign prostatic hyperplasia-BPH). *Id.*

[11] Atorvastatin is used along with a proper diet to help lower "bad" cholesterol and fats (such as LDL, triglycerides) and raise "good" cholesterol (HDL) in the blood. It belongs to a group of drugs known as "statins." *Id.*

[12] This medication is used to treat high blood pressure. *Id.*

According to the CDC, COVID-19 spreads mainly among people who are in close contact (i.e., within approximately 6 feet), and therefore limiting close contact with others is the best way to reduce the spread of COVID-19.[13]  COVID-19 spreads when an infected person coughs, sneezes, or talks, and droplets from their mouth or nose are launched into the air and land in the mouths or noses of people nearby or are inhaled into the lungs.  A person may contract COVID-19 by touching a surface or object that has the virus on it and then touching their mouth, nose, or eyes.[14]  COVID-19 spreads very easily and sustainably between people and is spreading more efficiently than influenza.[15]  *Anyone* can contract COVID-19 and spread it to others.  Recent studies indicate people who are Infected with the novel coronavirus but do not have symptoms likely also play a role in the spread of COVID-19.[16]  The more closely a person interacts with others and the longer that interaction, the higher the risk of COVID-19 spread.[17]   Therefore, the CDC

---

[13] CDC, *Prevent Getting Sick, Social Distancing*, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/socialdistancing. html. (hereinafter, "CDC Social Distancing Guidelines") (last accessed July 7, 2020).

[14] *Id.*

[15] CDC, *Prevent Getting Sick, How COVID-19 Spreads*, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covidspreads.html (last accessed July 7, 2020).

[16] *Id.*

[17] *Id.*

advises that maintaining a social distance of approximately 6 feet "is very important in preventing the spread of COVID-19,"[18] and "is one of the best tools we have to avoid being exposed to this virus and slowing its spread."[19]  Per the CDC, "[s]ocial distancing is especially important for people who are at higher risk of severe illness from COVID-19."[20]  Among adults, the risk of severe illness or death from COVID-19 increases with age.[21] Additionally, individuals of any age who have serious underlying medical conditions, including individuals with chronic obstructive pulmonary disease, serious heart conditions such as heart failure, coronary artery disease, or cardiomyopathies, Type 2 diabetes, chronic kidney disease, sickle cell disease, immunocompromised state from a solid organ transplant, and obesity (body mass index of 30 or higher) are at increased risk for severe illness or death from COVID-19.[22]  Individuals at any age might be at increased risk of severe illness from COVID-19 if they have the following

---

[18] *Id.*

[19] CDC Social Distancing Guidelines.

[20] *Id.*

[21] CDC, *Who is at Increased Risk for Severe Illness? Older Adults*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/olderadults. html (last accessed July 7, 2020).

[22] CDC, Who is at Increased Risk for Severe Illness? People with Certain Medical Conditions, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/ people-with-medical-conditions.html (last accessed July 7, 2020).

conditions: asthma, cerebrovascular diseases, cystic fibrosis, hypertension or high blood pressure, immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines, neurologic conditions such as dementia, liver diseases, pregnancy, pulmonary fibrosis, thalassemia, Type 1 diabetes, or individuals who are smokers.[23]

### 3. This Court should follow other courts that are already offering relief.

For example, in the Middle District of Pennsylvania, Judge John E. Jones varied downward from a sentence of imprisonment in two cases to a sentence of home confinement because of the pandemic.[24]  The Honorable Kiyo A. Matsumoto from the Eastern District of New York has also followed suit.  *United States v. Hansen,* No. 07-CR-00520(KAM), 2020 U.S. Dist. LEXIS 61946 (E.D.N.Y. Apr. 8, 2020).  States as well are taking similar actions.  The New Jersey Supreme Court Chief Justice entered an order on March 23, 2020; with the agreement of county prosecutors, the Attorney General, and Public Defenders; for the commutation or suspension of sentences to release approximately 1000 low-risk persons serving jail sentences.[25]  For persons in custody in federal prisons, President Trump is

---

[23] *Id.*

[24] See, *United States v. Foster*, 1:14-cr-324-02, (USDC MD Penn).

[25] https://www.njcourts.gov/pressrel/2020/pr032320a.pdf?c=lRD

10

considering issuing an Executive Order to release inmates in federal prisons.[26]
One of the reasons is because inmates are a high-risk group for contracting
coronavirus and are also in a high-risk group for serious complications from the
virus.  Also, persons with underlying health conditions, *regardless of their age*, are
in a high-risk group for serious complications from the coronavirus.  Samuels will
require neurosurgery due to a lodged bullet in his body.  None of these medical
issues can be addressed by the BOP and will only complicate his medical care if he
is infected with COVID-19.

### III. Experts agree that Inmates are at a higher risk of COVID 19.

Inmates are at a heightened risk of contracting COVID-19 as the pandemic
spreads. *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45
Clinical Infectious Diseases 1047, 1047 (Oct. 2007)[27] (noting that in jails "[t]he
probability of transmission of potentially pathogenic organisms is increased by
crowding, delays in medical evaluation and treatment, rationed access to soap,
water, and clean laundry, [and] insufficient infection-control expertise"); *see also*
Claudia Lauer & Colleen Long, *US Prisons, Jails On Alert for Spread of
Coronaviru*s, Associated Press (Mar. 7, 2020). The magnitude of this risk

---

[26] https://www.businessinsider.com/trump-consider-coronavirus-executive-order-federal-
prisons2020-3

[27] https://doi.org/10.1086/521910

11

continues to grow as the number of cases all over the United States rises

exponentially with each passing day. Social distancing and staying at home is

particularly vital because "[s]tudies suggest that coronaviruses (including

preliminary information on the COVID-19 virus) may persist on surfaces for a few

hours or up to several days."[28]  "According to a recent study published in the *New

England Journal of Medicine*, SARS-CoV-2, the virus that causes COVID-19, can

live in the air and on surfaces between several hours and several days.  The study

found that the virus is viable for up to 72 hours on plastics, 48 hours on stainless

steel, 24 hours on cardboard, and 4 hours on copper. It is also detectable in the air

for three hours."[29]  Hence, the rapid spread of COVID-19 can result from fomites

(objects or material that are likely to carry infections), such as elevator buttons,

restroom taps, and clothes.[30]  Spread is inevitable inside the jails.

---

[28] Q&A on coronaviruses (COVID-19), World Health Organization, at
https://www.who.int/news-room/q-a-detail/qa-coronaviruses (March 23, 2020)

[29] Samuel Volkin, How Long Can TheVirus That Causes COVID-19 Live On Surfaces?, John
Hopkins University HUB, (March 23, 2020) https://hub.jhu.edu/2020/03/20/sars-cov-2-survive-
on-surfaces/

[30] "Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020",
Emerging Infectious Diseases, 3/12/20, Volume 26, Number 6-June 2020, CDC (March 15,
2020) https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article

### 1. Medical experts agree that inmates like Samuels are at risk due to COVID-19.

Doctor Brie Williams is a licensed physician and Professor of Medicine at the University of California, San Francisco ("UCSF") in the Geriatrics Division, Director of UCSF's Amend: Changing Correctional Culture Program, as well as Director of UCSF's Criminal Justice & Health Program. Dr. Williams an expert in clinical research has focused on improved responses to disability, cognitive impairment, and symptom distress in older or seriously ill prisoners; a more scientific development of compassionate release policies; and broader inclusion of prisoners in national health datasets and clinical research. (See Exhibit C). In his expert opinion, Dr. Williams as determined that "the risk of infection and accelerated transmission of COVID-19 within jails and prisons is extraordinarily high" (Exh. B, p. 2), "inmate populations also have the highest risk of acute illness and poor health outcomes if infected with COVID-19"; (Exhibit C, p. 3) and that "the entire community is at risk if prison populations are not reduced." (Exhibit C, p. 3). In sum, as the World Health Organization has warned, prisons around the world can expect "huge mortality rates" from COVID-19 unless they take immediate action including screening for the disease.[31] The BOP is not actively

---

[31] Hannah Summers, 'Everyone Will Be Contaminated': Prisons Face Strict Coronavirus Controls, The Guardian (Mar. 23, 2020), https://www.theguardian.com/global-development/2020/mar/23/everyone-will-be-contaminatedprisons-face-strict-coronavirus-controls.

13

testing Samuels or any inmate at his facility for COVID-19.  Most staff, rightfully

so, are scared that they will infect themselves and their family.

Dr. Danielle C. Ompad, Ph.D. an expert regarding SARS-CoV-2 infection

(otherwise known as COVID-19) in correctional settings, takes a similar approach.

Dr. Ompad reaches a similarly grim conclusion:

a. The risk of transmission of COVID-19 in correctional settings is high.
Correctional facilities are often crowded and people who are incarcerated
(PWI) are likely unable to maintain the requisite social distance of six feet.
This is especially an issue within individual cells, where bunked beds make
distancing of six feet impossible. Cafeteria areas and dormitory-type sleep
quarters also create challenges to social distancing depending on how these
spaces are organized and the number of people in the space at any one time.

b. Correctional facilities have significant flows of people from the
community into the facility and back out. Correctional staff, visitors, and
attorneys come to and from the facility from their home communities. In
addition, newly incarcerated individuals, who have been circulating in the
community prior to entering the facility, are coming into facilities. As a
result, current PWI are likely to be exposed to COVID-19 through their
interactions with correctional staff, visitors, attorneys, and newly arrived
PWI.

c. Generally, there is a shortage of personal protective equipment (PPE) such
as N95 masks in the U.S. Local jurisdictions are prioritizing health care
facilities for scarce PPE, making access to such protective gear challenging
for correctional facility staff.

d. Client reports from nine Massachusetts correctional facilities revealed that
PWI at two facilities did not have access to soap at all and only three had
access to free soap. In four facilities, PWI did not have access to hand
sanitizer.

e. Thus, the risk for transmission in correctional facilities may be high. This
will have implications for the general population from which correctional
staff, visitors, and attorneys come and as a result, may place communities in

which correctional facilities are located at enhanced risk of COVID-19
transmission as well as challenging the limited health care infrastructure and
staff in local hospitals.

Id. (Exhibit D, Expert Report Dr. Danielle C. Ompad, Ph.D. At ¶-6)

Dr. Ompad concludes that the risk of severe disease and death among

incarcerated individuals is high:

a. If COVID-19 enters correctional facilities, the likelihood that there will be
severe cases is high. According to the Massachusetts Department of
Corrections, 983 PWI (11.2%) were aged 60 and over in 2019 among 8,784
total PWI. As previously mentioned, older adults are at increased risk for
severe COVID-19 complications as well as death.

b. According to data from the 2011-2012 National Inmate Survey,11 there is
a substantial burden of disease among correctional populations.
Approximately half of state and federal prisoners and jail inmates have ever
had a chronic medical condition (defined as cancer, high blood pressure,
stroke-related problems, diabetes, heart-related problems, kidney-related
problems, arthritis, asthma, and/or cirrhosis of the liver). Twenty-one
percent of state and federal prisoners and 14% of jail inmates have ever had
tuberculosis, hepatitis B or C, or sexually transmitted infections (excluding
HIV or AIDS).

Id. (Exhibit D, Expert Report Dr. Danielle C. Ompad, Ph. D. at ¶-6)

In essence, Dr. Ompad sums up her opinion as follows "By acting now and

releasing a significant number of people who are currently detained you will save

lives." *Id.* at 7.

### IV. Attorney General Barr has encouraged the use of home confinement due to the COVID 19 pandemic.

On April 3, 2020, the Attorney General Barr directed all federal prisons to begin immediately, processing inmates that are affected by COVID 19 for release, quarantine, and/or home confinement. (See Exhibit E). Recognizing the urgency of protecting federal inmates from the spread of the COVID-19 pandemic, Attorney General Barr issued a memorandum on March 26, 2020 ("March 26 Memorandum") directing the BOP to prioritize the use of its "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." *Id.* at 1. The March 26 Memorandum also provided a non-exhaustive list of discretionary factors that the BOP may consider in assessing which inmates should be granted home confinement, including (i) "[t]he age and vulnerability of the inmate to COVID-19"; (ii) "[t]he security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities"; (iii) "[t]he inmate's conduct in prison"; and (iv) "[t]he inmate's crime of conviction, and assessment of the danger posed by the inmate to the community." See *id.* at 1-2. Barr, under the authority of the CARES ACT, directed that all "at-risk inmates be considered" no only those previously eligible for transfer. Samuels indirectly meets these criteria for release. It also bears emphasis that Samuels is a prime candidate for this type of

16

"extraordinary" and "compelling" relief. 18 USC § 3582(c)(1)(A)(i). He has an unblemished record in prison.

His track record of compliance reflects a greater level of respect and responsibility that militates in favor of the requested relief. Any possible benefits in having Samuels serve the rest of his sentence at FCI Fort Dix's Camp before his scheduled release to halfway house placement is far outweighed by the risks presented to Samuels by this historic pandemic.

### 1. Samuels's Post Release Plans

If this motion is granted, Samuels will be will reside with his family in Elmont, NY, will quarantine as required by the CDC and by Attorney General Barr's directives.  His family is quarantining and is in great health with no known exposure to or exhibited symptoms of COVID-19.  After the release and while in home confinement, he will stay at his residence family Maureen Dazevedo, 1339 L. Street, Elmont, NY 11003, and he will self-quarantine and best protect himself and others in the community from exposure to COVID-19.  Samuels's family can support him financially during home confinement and will enroll in private health insurance as soon as he is released. If he is released, he will be able to be treated by his long-time physician should the need occur. Therefore, based on the totality of the circumstances, releasing Samuels to his family in Elmont, NY will not

increase—and would likely decrease—his risk of contracting the potentially fatal disease.

## CONCLUSION

Because prison conditions that place him at greater risk from the coronavirus, that will not improve, and because the coronavirus presents a national emergency; Samuels requests that this Court grant his release.

Done this ⎿4⏌, day of September 2020.

Milton Samuels
Register Number: 61523-054
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

18

## CERTIFICATE OF SERVICE

I hereby do certify that on ⎇, of September 2020, I filed the foregoing document with the Clerk of Court via the Prison Legal Mail System mailing copies to all participants:

U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007

Milton Samuels
Register Number: 61523-054
FCI Fort Dix
P.O. Box 2000
Joint Base MDL, NJ 08640

19



U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution
P.O. Box 38
Joint Base MDL, NJ 08640

June 22, 2020



RE: Samuels, Milton
    Register Number: 61523-054

Dear ███████,

This letter is in response to your inquiry regarding Milton Samuels, an inmate currently confined at the Federal Correctional Institution (FCI) Fort Dix, New Jersey.  In your correspondence, you request inmate Samuels be placed on Home Confinement under the CARES Act based on concerns related to the COVID-19 pandemic.

Inmate Samuels arrived at FCI Fort Dix, on May 24, 2016, as a Lesser Security transfer.  He is serving a 276 month sentence for Conspiracy to Distribute Cocaine and Use and Carrying a Firearm in Relation to a Drug Trafficking Crime.  He has a May 28, 2028, projected release date via Good Conduct Time Release.

According to a directive from the U.S. Attorney General, dated March 26, 2020, inmates convicted of serious offenses will not be considered for home confinement. Inmate Samuels was convicted of Use and Carrying a Firearm in Relation to a Drug Trafficking Crime.  According to Program Statement 5162.05, <u>Categorization of Offenses</u>, inmate Samuels' instant offense is categorized as a crime of violence.  Based on the serious nature of the offense, he is ineligible for consideration for home confinement under the CARES Act at this time.

I trust this information has addressed your concerns.

Sincerely,

David E. Ortiz
Warden

cc: Milton Samuels
    Register No. 61523-054

Exhibit A

**(REDACTED)**

```
-------------------------------  x
                                 :
                                 :
                                 :
                                 :
                                 :
APPLICATION FOR RELEASE FROM     :    AFFIDAVIT OF BRIE WILLIAMS,
CUSTODY                          :    M.D.
                                 :
                                 :
                                 :
                                 :
                                 :
                                 :
-------------------------------  X
```

I, Brie Williams, hereby affirm as follows:

     1.     I am a doctor duly licensed to practice medicine in the State of California.

     2.     I am currently a Professor of Medicine at the University of California, San Francisco ("UCSF") in the Geriatrics Division, Director of UCSF's Amend: Changing Correctional Culture Program, as well as Director of UCSF's Criminal Justice & Health Program. In that capacity, my clinical research has focused on improved responses to disability, cognitive impairment, and symptom distress in older or seriously ill prisoners; a more scientific development of compassionate release policies; and a broader inclusion of prisoners in national health datasets and in clinical research. I have developed new methods for responding to the unique health needs of criminal justice-involved older adults—including an evidence-based approach to reforming compassionate release policies and the design of a new tool to assess physical functioning in older prisoners. I was previously a consultant for the California Department of Corrections and Rehabilitation, as well as for other state prison systems.

     3.     I have extensive experience working with vulnerable populations, in particular the incarcerated and the elderly.

Exhibit C

4.      I submit this affidavit in support of any defendant seeking release from custody during the COVID-19 pandemic, so long as such release does not jeopardize public safety and the inmate can be released to a residence in which the inmate can comply with CDC social distancing guidelines. The statements in this affidavit are based only on the current state of emergency and the circumstances described below.

**The Risk of Infection and Accelerated Transmission of COVID-19 within Jails and Prisons is Extraordinarily High.**

5.      Prisons and jails are not actually isolated from our communities: hundreds of thousands of correctional officers and correctional healthcare workers enter these facilities every day, returning to their families and to our communities at the end of their shifts, bringing back and forth to their families and neighbors and to incarcerated patients any exposures they have had during the day. Access to testing for correctional staff has been "extremely limited," guards have reported a "short supply" of protective equipment, and prisons are not routinely or consistently screening correctional officers for symptoms.[1]

6.      The risk of exposure is particularly acute in pre-trial facilities where the inmate populations shift frequently.[2] For example, despite the federal government's guidance to stay

---

[1] Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://www.vice.com/en_ca/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

*See also* Daniel A. Gross, *"It Spreads Like Wildfire": The Coronavirus Comes to New York's Prisons*, The New Yorker (Mar. 24, 2020), https://www.newyorker.com/news/news-desk/it-spreads-like-wildfire-covid-19-comes-to-new-yorks-prisons; Josiah Bates, *'We Feel Like All of Us Are Gonna Get Corona.' Anticipating COVID-19 Outbreaks, Rikers Island Offers Warning for U.S. Jails, Prisons*, Time (Mar. 24, 2020), https://time.com/5808020/rikers-island-coronavirus/; Sadie, Gurman, *Bureau of Prisons Imposes 14-Day Quarantine to Contain Coronavirus*, WSJ (Mar. 24, 2020), https://www.wsj.com/articles/bureau-of-prisons-imposes-14-day-quarantine-to-contain-coronavirus-11585093075; Cassidy McDonald, *Federal Prison Workers Say Conflictings Orders on Coronavirus Response Is Putting Lives at Risk*, CBS News (Mar. 19, 2020), https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/.

[2] Emma Grey Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*, Wired (Mar. 24, 2020), https://www.wired.com/story/coronavirus-covid-19-jails-prisons/.

inside and many states' stay-in-place orders, many prosecutors are still arresting individuals and seeking detention.[3]   Pre-trial detention facilities are still accepting new inmates who are coming from communities where COVID-19 infection is rampant.   As of today's date, the Bureau of Prisons is still moving inmates from facility to facility, including prisoners in New York.[4]

7.      Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons.   Inmates share small cells, eat together and use the same bathrooms and sinks.   They eat together at small tables that are cleaned only irregularly.   Some are not given tissues or sufficient hygiene supplies.[5]   Effective social distancing in most facilities is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as a lack of hand sanitizer or sufficient opportunities to wash hands.[6]

**Inmate Populations Also Have the Highest Risk of Acute Illness and Poor Health Outcomes if Infected with COVID-19.**

8.      There   are   more   than   2.3   million people   incarcerated   in   the   United States[7]

---

[3] Stephen Rex Brown, *'Business as Usual' For Federal Prosecutors Despite Coronavirus, Nadler Writes, Calling for Release of Inmates*, N.Y. Daily News (Mar. 20, 2020), https://www.nydailynews.com/new-york/ny-nadler-doj-inmates-20200320-d6hbdjcuj5aitppi3ui2xz7tjy-story.html.

[4] Courtney Bublé, *Lawmakers, Union Urge Halt to All Prison Inmate Transfers*, Government Executive (Mar. 25, 2020), https://www.govexec.com/management/2020/03/lawmakers-union-urge-halt-all-prison-inmate-transfers/164104/; Hamilton, *Sick Staff, Inmate Transfers*; Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates*, ABC News (Mar. 23, 2020),https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416.

[5] Justine van der Leun, *The Incarcerated Person Who Knows How Bad It Can Get*, Medium (Mar. 19, 2020), https://gen.medium.com/what-its-like-to-be-in-prison-during-the-coronavirus-pandemic-1e770d0ca3c5 ("If you don't have money, you don't have soap or tissues."); Keri Blakinger and Beth Schwartzapfel, *How Can Prisons Contain Coronavirus When Purrell Is a Contraband?*, ABA Journal (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[6] Rosa Schwartzburg, *'The Only Plan the Prison Has Is to Leave Us To Die in Our Beds'*, The Nation (Mar. 25, 2020), https://www.thenation.com/article/society/coronavirus-jails-mdc/.

[7] Kimberly Kindy *et al.*, *'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons Face Coronavirus Threat*, Washington Post (Mar. 25, 2020), https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html.

approximately 16% of whom are age 50 or older.[8]   The risk of coronavirus to incarcerated seniors

is high.  "Their advanced age, coupled with the challenges of practicing even the most basic disease

prevention measures in prison, is a potentially lethal combination."[9]   To make matters worse,

correctional facilities are often ill-equipped to care for aging prisoners, who are more likely to

suffer from chronic health conditions than the general public.

9.      An estimated 39-43% of all prisoners, and over 70% of older prisoners, have at

least one chronic condition, some of the most common of which are diabetes, hypertension, and

heart problems.[10] According to the CDC, each of these conditions—as well as  chronic bronchitis,

emphysema, heart failure, blood disorders, chronic kidney disease, chronic liver disease, any

condition or treatment that weakens the immune response, current or recent pregnancy in the last

two weeks, inherited metabolic disorders and mitochondrial disorders, heart disease, lung disease,

and certain neurological and neurologic and neurodevelopment conditions[11]—puts them at a

"high-risk for severe illness from COVID-19."[12]

---

[8] Brie Williams *et al.*, *Strategies to Optimize the Use of Compassionate Release from US Prisons*, 110 AJPH S1, S28 (2020), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305434; Kimberly A. Skarupski, *The Health of America's Aging Prison Population*, 40 Epidemiologic Rev. 157, 157 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5982810/.

[9]  Weihua Li and Nicole Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19*, The Marshall Project (Mar. 19, 2020), https://www.themarshallproject.org/2020/03/19/this-chart-shows-why-the-prison-population-is-so-vulnerable-to-covid-19.

[10] Brie A. Williams *et al.*, *How Health Care Reform Can Transform the Health of Criminal Justice-Involved Individuals*, 33 Health Affairs 462-67 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4034754/; Brie A. Williams *et al.*, *Coming Home: Health Status and Homelessness Risk of Older Pre-release Prisoners*, 25 J. Gen. Internal Med. 1038-44 (2010), *available at*  https://link.springer.com/content/pdf/10.1007/s11606-010-1416-8.pdf; Laura M. Maruschak *et al.*, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, U.S. Dept of Justice (Oct. 4, 2016), at 5, *available at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[11] Harvard Health Publishing, *Coronavirus Research Center*, Harvard Medical School (Mar. 25, 2020), https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center.

[12] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: People Who Are at Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last updated Mar. 22, 2020).

10.     However, even many young federal prisoners suffer from asthma, rendering them also very vulnerable to coronavirus.[13]

11.     But it is not only the elderly, or those with preexisting medical conditions that are at risk of coronavirus in a correctional setting.  As of March 23, 2020, New York City reported that "[p]eople ranging in ages from 18 to 44 have accounted for 46 percent of positive tests."[14] Across the United States, 38% of those hospitalized are between the ages of 20 and 54 and 12% of the intensive care patients are between 20 and 44.[15]

12.     This data is of particular concern for inmate populations, since prisoners' physiological age *averages 10 to 15 years older* than their chronological age.[16]  Therefore, the consensus of those who study correctional health is that inmates are considered "geriatric, by the age of 50 or 55 years."[17]  It is not clear that prison health care administrations are taking accelerated ageing into account when determining the eligibility criteria for age-related screening tools and medical care protocols for coronavirus, potentially leaving large swathes of the prison population at risk.[18]

---

[13] Laura Maruschak, *Medical Problems of Jail Inmates*, Dep't of Justice (Nov. 2006), at p. 2, *available at* https://www.bjs.gov/content/pub/pdf/mpji.pdf.

[14] Kimiko de Freytas-Tamura, *20-Somethings Now Realizing That They Can Get Coronavirus, Too*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/nyc-coronavirus-young.html.

[15] *Id.*

[16] Brie A. Williams *et al.*, *Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care*, 102 Am. J. Public Health 1475-81 (2012), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/; *see also* Brie Williams *et al.*, *Detained and Distressed: Persistent Distressing Symptoms in a Population of Older Jail Inmates*, 64 J. Am. Geriatrics Soc. 2349-55 (2016), https://onlinelibrary.wiley.com/doi/pdf/10.1111/jgs.14310 ("For example, older jail inmates with an average age of 60 in this study reported poor or fair health [and] chronic lung disease . . . at rates similar to those reported by community-based lower income older adults with an average age of 72.").

[17] Brie A. Williams *et al.*, *The Older Prisoner and Complex Chronic Medical Care* 165-70 in World Health Organization, *Prisons and Health* (2014), https://pdfs.semanticscholar.org/64aa/10d3cff6800ed42dd152fcf4e13440b6f139.pdf.

13.     In one study, we found that inmates who died in hospitals were, on average, nearly two decades younger than non-incarcerated decedents, had significantly shorter hospitalizations, and had higher rates of several chronic conditions including cancer, liver disease and/or hepatitis, mental health conditions, and HIV/AIDS."[19]

**The Entire Community is at Risk If Prison Populations Are Not Reduced**

14.     As the World Health Organization has warned, prisons around the world can expect "huge mortality rates" from Covid-19 unless they take immediate action including screening for the disease.[20]

15.     As of March 24, 2020, at least 38 people involved in the New York City correctional system have tested positive for Covid-19.[21]  Already, three inmates and three staff at federal correctional facilities across the United States have tested positive for the coronavirus, according to the Federal Bureau of Prisons.[22]

16.     Jails and prisons are fundamentally ill-equipped to handle a pandemic.

17.     Medical treatment capacity is not at the same level in a correctional setting as it is in a hospital.  Some correctional facilities have no formal medical ward and no place to quarantine

---

[18] Brie A. Williams *et al.*, *Differences Between Incarcerated and Non-Incarcerated Patients Who Die in Community Hospitals Highlight the Need For Palliative Care Services For Seriously Ill Prisoners in Correctional Facilities and in Community Hospitals: a Cross-Sectional Study*, 32 J. Pallitive Med. 17-22 (2018), *available at* https://journals.sagepub.com/doi/pdf/10.1177/0269216317731547.

[19] *Id.* at 20.

[20] Hannah Summers, *'Everyone Will Be Contaminated': Prisons Face Strict Coronavirus Controls*, The Guardian (Mar. 23, 2020), https://www.theguardian.com/global-development/2020/mar/23/everyone-will-be-contaminated-prisons-face-strict-coronavirus-controls.

[21] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons.*

[22] Ryan Lucas, *As COVID-19 Spreads, Calls Grow to Protect Inmates in Federal Prisons*, NPR (Mar. 24, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/24/820618140/as-covid-19-spreads-calls-grow-to-protect-inmates-in-federal-prisons.

sick inmates, other than the facilities' Special Housing Unit (SHU).[23]  While the cells in the SHU

have solid doors to minimize the threat of viral spread in otherwise overcrowded facilities, they

rarely have intercoms or other ways for sick inmates to contact officers in an emergency.[24]  This

is particularly dangerous for those with COVID-19 infection since many patients with COVID-19

descend suddenly and rapidly into respiratory distress.[25]

    18.    Even those facilities that do have healthcare centers can only treat relatively mild

types of respiratory problems for a very limited number of people.[26]  This means that people who

become seriously ill while in prisons and jails will be transferred to community hospitals for care.

At present, access to palliative care in prison is also limited.

    19.    Corrections officers may also be particularly vulnerable to coronavirus due to

documented high rates of diabetes and heart disease.[27]  Prison staff in Pennsylvania, Michigan,

New York and Washington state have tested positive for the virus, resulting in inmate quarantines.

In Washington, D.C., a U.S. marshal who works in proximity to new arrestees tested positive for

the virus, meaning dozens of defendants headed for jail could have been exposed.[28]  In New York,

---

[23] MCC New York COVID 19 Policy Memo, Mar. 19, 2020, https://www.documentcloud.org/documents/6818073-MCC-New-York-COVID-19-Policy-Memo.html; Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[24] Brie Williams *et al.*, *Correctional Facilities in the Shadow of COVID-19: Unique Challenges and Proposed Solutions*, Health Affairs (Mar. 26, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/.

[25] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19–Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[26] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*; Li and Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19.*

[27] Brie Williams, *Role of US-Norway Exchange in Placing Health and Well-Being at the Center of US Prison Reform*, https://ajph.aphapublications.org/doi/10.2105/AJPH.2019.305444 (published Jan. 22, 2020).

[28] Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, WSJ (Mar. 22, 2020), https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600 ("We're all headed for some dire consequences," said Daniel Vasquez, a former warden of San Quentin and Soledad state prisons in

236 members of the New York Police Department have tested positive for coronavirus and 3,200 employees are sick, triple the normal sick rate.[29]  Two federal prison staffers have also tested positive.[30]

20.     For this reason, correctional health is public health. Decreasing risk in prisons and jails decreases risk to our communities.

21.     Reducing the overall population within correctional facilities will also help medical professionals spread their clinical care services throughout the remaining population more efficiently.  With a smaller population to manage and care for, healthcare and correctional leadership will be better able to institute shelter in place and quarantine protocols for those who remain. This will serve to protect the health of both inmates as well as correctional and healthcare staff.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: San Francisco, California
       March 27, 2020

_____
Dr. Brie Williams

---

California. "They're in such close quarters—some double- and triple-celled—I think it's going to be impossible to stop it from spreading.").

[29] Erin Durkin, *Thousands of NYPD Officers Out Sick Amid Coronavirus Crisis*, Politico (Mar. 25, 2020), https://www.politico.com/states/new-york/albany/story/2020/03/25/thousands-of-nypd-officers-out-sick-amid-coronavirus-crisis-1268960.

[30] Elinson and Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak.*

**Affidavit of Danielle C. Ompad, PhD regarding SARS-CoV-2 infection (otherwise known as COVID-19) in correctional settings**

I, Dr. Danielle C. Ompad, state that the following is a true and accurate statement to the best of my knowledge and belief:

1. I am currently an Associate Professor of Epidemiology at the New York University School of Global Public Health. I have a BS in biology from Bowie State University, and an MHS and PhD in infectious disease epidemiology from the Johns Hopkins School of Public Health.

2. Classically trained as an infectious disease epidemiologist, I am an expert on social determinants of health associated with urban life. My research is focused on the health and wellbeing of people living in urban settings, especially communities that are highly marginalized and vulnerable. Many of these communities have high rates of heroin, crack, and/or cocaine use. My program of research is focused on individual- and structural-level risk and protective factors for the initiation, use, and cessation of specific drugs as well as risk for infectious diseases such as HIV, hepatitis B and C viruses (HBV and HCV), and sexually transmitted infections like herpes and human papillomavirus. Additional and related programs of research include (1) understanding sexual risk and (2) vaccine access among people who use drugs (PWUD) and other vulnerable populations.

3. I have been working with people who use drugs since 1997, many of whom have experience with the criminal justice system. I am providing this affidavit about the risk of SARS-CoV-2 infection, also known as COVID-19 or the novel coronavirus, because correctional settings may be particularly vulnerable to the effects of this pandemic.

4. I am the author of more than 125 peer-reviewed research articles, six book chapters, and two encyclopedia entries.

5. **Overview of the COVID-19 pandemic**
   a. The first case of COVID-19 was diagnosed in Wuhan, China on 29 December 2019. The virus is transmitted through droplets and contaminated surfaces,[1] and possible airborne transmission.[2] Both symptomatic and asymptomatic people can transmit COVID-19.[3] The average incubation period (i.e., time from infection to symptoms) for COVID-19 has generally been reported to be 5.1 days and 97.5% of those who develop symptoms will do so within 11.5 days.[4]
   b. Older adults and people with underlying health conditions like cardiovascular diseases, respiratory diseases, diabetes, and liver disease are at increased risk for severe COVID-

---

[1] Adhikari SP, Meng S, Wu YJ, et al. Epidemiology, causes, clinical manifestation and diagnosis, prevention and control of coronavirus disease (COVID-19) during the early outbreak period: a scoping review. Infect Dis Poverty. 2020;9(1):29. Published 2020 Mar 17. doi:10.1186/s40249-020-00646-x

[2] van Doremalen N, Bushmaker T, Morris DH, et al. Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1 [published online ahead of print, 2020 Mar 17]. N Engl J Med. 2020; 10.1056/NEJMc2004973. doi:10.1056/NEJMc2004973

[3] Tong ZD, Tang A, Li KF, et al. Potential Presymptomatic Transmission of SARS-CoV-2, Zhejiang Province, China, 2020 [published online ahead of print, 2020 May 17]. Emerg Infect Dis. 2020;26(5):10.3201/eid2605.200198. doi:10.3201/eid2605.200198

[4] Lauer SA, Grantz KH, Bi Q, et al. The Incubation Period of Coronavirus Disease 2019 (COVID-19) From Publicly Reported Confirmed Cases: Estimation and Application [published online ahead of print, 2020 Mar 10]. Ann Intern Med. 2020;10.7326/M20-0504. doi:10.7326/M20-0504

Exhibit D

19 complications and death. Of note, risk for death appears to increase substantially with age although actual age-specific death rates should be considered in the context of a lack of widespread testing in most countries, including the U.S. In most countries testing is being conducted among hospitalized cases and health care workers. South Korea is the exception, where mild and severe cases have been tested with over 300,000 people have been tested.

c.  The case fatality rate (CFR) is the number of deaths divided by the number of people with COVID-19. Note that the denominator (i.e., number of people with COVID-19) is determined by the number of people tested as well as the testing criteria. Therefore, the CFR is likely inflated (i.e., an overestimate). The World Health Organization estimates that the overall case fatality rate is 3.4%.[5] Table 1 provides case fatality rates from Italy by decade of age. You can see that risk of death starts increasing among people in their sixties and then increases dramatically for each decade of life thereafter.

## Figure 1. COVID-19 case fatality rates by age group as of 15 March 2020, Italy



Age group

d.  Recent reporting revealed that young people are experiencing severe disease. The New York Times reported that approximately 40% of hospitalized COVID-19 cases were under the age of 60.[6]

e.  Prevention of COVID-19 transmission is highly dependent on physical social distancing (i.e., at least six feet from other people) as well as hand washing and sanitizing with an alcohol-based hand sanitizer. Surfaces should be cleaned and disinfected regularly. Confirmed COVID-19 cases (with or without symptoms) must be quarantined to prevent transmission. People who have been exposed to someone who has (or may have) COVID-19 are asked to self-isolate for at least two weeks. Many US jurisdictions are

---

[5] WHO Director-General's opening remarks at the media briefing on COVID-19 - 3 March 2020 - World Health Organization, March 3, 2020
[6] Belluck P. Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S. New York Times. 20 March 2020

beginning to ask residents to engage in physical social distancing and self-isolation. Non-essential workers and businesses are being asked to close.

f.   As 20 March 2020, the Johns Hopkins COVID-19 dashboard[7] reports that there are 259,215 cases worldwide and 11,283 deaths. COVID-19 cases have been detected in all 50 states, the District of Columbia, American Samoa, Guam, Puerto Rico, and the U.S. Virgin Islands (Figure 2). As of 20 March 2020, there are 17,303 reported cases and 215 deaths in the United States.[8] Testing for COVID-19 infections has not been fully implemented and is mainly targeted to hospitalized people with COVID-19 symptoms (i.e., dry cough, fever, shortness of breath, acute respiratory distress syndrome), those with contact with a suspected or known cases, and health care workers with symptoms, known exposure to a case, or travel history to countries with cases; people with mild symptoms are not generally being tested because of the limited supply of tests. As a result, any case counts are an underestimate of the true number of cases.

Figure 2. Distribution of COVID-19 cases in the United States as of 18 March 2020 (U.S. Centers for Disease Control and Prevention)



---

[7] https://www.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6
[8] Reported cases include both confirmed and presumptive positive cases of COVID-19 reported to CDC or tested at CDC since January 21, 2020, with the exception of testing results for persons repatriated to the United States from Wuhan, China and Japan.

g.  Data from South Korea, where testing is conducted for mild and severe cases (more than 300,000 tested so far),[9] suggest that individuals in their 20s have the highest prevalence of COVID-19 infection (Figure 3).[10]

Figure 3. COVID-19 cases (%) in South Korea and Italy by age group



## 6.  Transmission risk in correctional settings

a.  The risk of transmission of COVID-19 in correctional settings is high. Correctional facilities are often crowded and people who are incarcerated (PWI) are likely unable to maintain the requisite social distance of six feet. This is especially an issue within individual cells, where bunked beds make distancing of six feet impossible.  Cafeteria areas and dormitory-type sleep quarters also create challenges to social distancing depending on how these spaces are organized and the number of people in the space at any one time.

b.  Correctional facilities have significant flows of people from the community into the facility and back out. Correctional staff, visitors, and attorneys come to and from the facility from their home communities. In addition, newly incarcerated individuals, who have been circulating in the community prior to entering the facility, are coming into facilities. As a result, current PWI are likely to be exposed to COVID-19 through their interactions with correctional staff, visitors, attorneys, and newly arrived PWI.

c.  Generally, there is a shortage of personal protective equipment (PPE) such as N95 masks in the U.S. Local jurisdictions are prioritizing health care facilities for scarce PPE, making access to such protective gear challenging for correctional facility staff.

d.  Client reports from nine Massachusetts correctional facilities revealed that PWI at two facilities did not have access to soap at all and only three had access to free soap. In four facilities, PWI did not have access to hand sanitizer.

e.  Thus, the risk for transmission in correctional facilities may be high. This will have implications for the general population from which correctional staff, visitors, and attorneys come and as a result, may place communities in which correctional facilities are located at enhanced risk of COVID-19 transmission as well as challenging the limited health care infrastructure and staff in local hospitals.

---

[9] Zastrow M. South Korea is reporting intimate details of COVID-19 cases: has it helped? [news]. Nature 2020.
[10] https://medium.com/@andreasbackhausab/coronavirus-why-its-so-deadly-in-italy-c4200a15a7bf

7. **Risk for severe disease and death among incarcerated individuals**
   a. If COVID-19 enters correctional facilities, the likelihood that there will be severe cases is high. According to the Massachusetts Department of Corrections, 983 PWI (11.2%) were aged 60 and over in 2019 among 8,784 total PWI. As previously mentioned, older adults are at increased risk for severe COVID-19 complications as well as death.
   b. According to data from the 2011-2012 National Inmate Survey,[11] there is a substantial burden of disease among correctional populations. Approximately half of state and federal prisoners and jail inmates have ever had a chronic medical condition (defined as cancer, high blood pressure, stroke-related problems, diabetes, heart-related problems, kidney-related problems, arthritis, asthma, and/or cirrhosis of the liver). Twenty-one percent of state and federal prisoners and 14% of jail inmates have ever had tuberculosis, hepatitis B or C, or sexually transmitted infections (excluding HIV or AIDS). Table 1 displays lifetime prevalence of specific chronic conditions with implications for COVID-19 severity and death among state and federal prisoners and jail inmates. Note that older prisoners were about three times more likely than younger persons to have had a chronic condition or infectious disease in their lifetime.

Table 1.  Lifetime prevalence of specific chronic conditions and infectious diseases with implications for COVID-19 severity and death among state and federal prisoners and jail inmates, 2011-2012 National Inmate Survey

| Condition | State and federal prisoners (%) | Jail inmates (%) |
|---|---|---|
| Cancer | 3.5 | 3.6 |
| Diabetes | 9.0 | 7.2 |
| Stroke-related problems | 1.8 | 2.3 |
| Heart-related problems | 9.8 | 10.4 |
| Kidney-related problems | 6.1 | 6.7 |
| Asthma | 14.9 | 20.1 |
| Cirrhosis of the liver | 1.8 | 1.7 |
| Tuberculosis | 6.0 | 2.5 |
| Hepatitis B | 10.9 | 1.7 |
| Hepatitis C | 2.7 | 5.6 |
| HIV/AIDS | 9.8 | 1.3 |

---

[11] Maruschak LM, Berzofsky M, Unangst J. Medical problems of state and federal prisoners and jail inmates, 2011-12. Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics; 2015 Feb.

    c. Collectively, these data suggest that there is a risk that a significant proportion of PWI will experience severe COVID-19 disease requiring hospitalization and many are at risk of dying from COVID-19.

8. **Healthcare response and correctional settings**
   a. Healthcare provision in correctional settings is limited and a rapid increase in COVID-19 cases may overwhelm the capacity of a jail or prison's healthcare facilities. Moreover, health care providers in correctional settings may not have the equipment (i.e., ventilators) or specialty skill set to support PWI with severe COVID-19 disease.
   b. There is already growing concern in the medical community that the need for intensive care unit beds and ventilators will outstrip the supply. We saw this in China, where new hospitals were built to treat the surge in patients. We are seeing this now in northern Italy, where unused wards are being retrofitted to serve as ICUs.
   c. Severe COVID-19 cases in correctional facilities may be transferred to local hospitals. An outbreak at a local correctional facility, where there is a high likelihood of rapid transmission to a large number of people, could quickly overwhelm local hospitals.

9. **What would an outbreak look like in a correctional facility?**
   a. There are no descriptions of a COVID-19 outbreak in a correctional facility to date. However, we can hypothesize what one may look like drawing on published reports of influenza and tuberculosis outbreaks – both respiratory infections – in correctional facilities.[12,13]
   b. Introduction of the SAR-CoV-2 virus to the correctional facility could be from visitors, correctional staff, attorneys, and/or a newly incarcerated person. The person will likely be asymptomatic. As a result, the first facility-acquired COVID-19 case will not be detected until the that person is shows symptoms. This means that the person could have transmitting the infection from 2 to 14 days without knowing it.
   c. The opportunities for transmission in correctional facilities are myriad and there is limited ability for PWI to engage in social distancing or self-isolation. The minimum cell size in the U.S. is 80 square feet based on American Correctional Association standards.[14] Some cells in Massachusetts are approximately 73 square feet. Beds can be bunked, ensuring that PWI are within six feet of each other in shared cells. Community meals in cafeteria/chow hall type settings as well as group recreation time in gyms and outdoor spaces also make social distancing challenging.
      i. At the Hampshire House of Corrections and North Central Correctional Institution in Gardner, groups of inmates are still going to "chow" and sitting and eating together with no instructions regarding social distancing.
      ii. At the Middleton House of Corrections, a whole unit has been quarantined in the gym.
   d. Given the crowded conditions as well as challenges with social distancing and access to PPE for staff, the infections could spread rapidly and by the time the first case is identified many will have already been infected.
   e. After the first symptomatic case is identified, the number of additional cases is likely to occur rapidly over the next days and weeks. The hospitalization rate is unknown at this

---

[12] Sosa LE, Lobato MN, Condren T, Williams MN, Hadler JL. Outbreak of tuberculosis in a correctional facility: consequences of missed opportunities. Int J Tuberc Lung Dis. 2008;12(6):689–691.
[13] Awofeso N, Fennell M, Waliuzzaman Z, et al. Influenza outbreak in a correctional facility. Aust N Z J Public Health. 2001;25(5):443–446.
[14] http://www.aca.org/ACA_Prod_IMIS/docs/Standards%20And%20Accreditation/RH%20-%20Proposed%20Standards%20.%2012.4.2015.pdf

point, but given the high burden of high-risk conditions among PWI, we can anticipate the jail and prison health facilities will face shortages of beds, ventilators, PPE, testing supplies, and masks.

f. When correctional facility health services are exhausted, or the type of care needed for a patient is beyond the capacity of the facility, PWI COVID-19 cases will need to be transferred to local hospitals.

**10. Summary**

a. Incarcerating individuals who cannot make bail as well as current PWI that do not pose a danger to the community may increase the risk of COVID-19 outbreaks in correctional facilities when we consider the following issues:

   i. COVID-19 transmission is possible even when people are asymptomatic and the average incubation period is five days.

   ii. According to the Massachusetts Department of Corrections, 19.4% of PWI in 2019 were between the ages of 18 and 29. Some evidence suggests that this age group has the highest prevalence of COVID-19.

   iii. There is high risk for transmission in correctional facilities.

   iv. A substantial proportion of PWI aged 60 and older and/or with health conditions with implications for severe COVID-19 disease requiring hospitalization and possibly resulting in death

   v. The implications of a correctional facility outbreak for local hospitals.

b. By acting now and releasing a significant number of people who are currently detained you will save lives. You can prevent outbreaks in correctional facilities by reducing the number of people who are coming in from the community and reducing the number of people at risk within the facilities. This action would then protect correctional officers, attorneys, and PWI as well as the families of these groups.

c. This would result in the courts contributing to "Flatten the Curve" efforts because it will increase the ability of PWI and correctional facility staff to engage in social distancing inside as well as allowing released criminal-justice involved people to engage in social distancing and/or self-isolation (as appropriate) in the community, thereby reducing the likelihood of transmission and disease.

Signed this 20th day of March, 2020,

Danielle C. Ompad, PhD[15]
Associate Professor of Epidemiology
New York University School of Global Public Health

---

[15] This statement reflects my own views. I do not speak for New York University or any department therein.



# Office of the Attorney General
## Washington, D. C. 20530

March 26, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS

FROM:          THE ATTORNEY GENERAL

SUBJECT:       <u>Prioritization of Home Confinement As Appropriate in Response to</u>
               <u>COVID-19 Pandemic</u>

Thank you for your tremendous service to our nation during the present crisis. The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times. We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe. At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities. I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

## I.  TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH

One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances. I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

Exhibit E

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement. We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

## II.    PROTECTING THE PUBLIC

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public. That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways. I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public. I thank you for your service to the country and assistance in implementing this Memorandum.



**Office of the Attorney General**
**Washington, D. C. 20530**

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:        THE ATTORNEY GENERAL

SUBJECT:   Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

**I.    IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS**

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.   PROTECTING THE PUBLIC

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

Memorandum from the Attorney General                                    Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.



USPS FIRST-CLASS PKG™

SHIP
TO:

Milton Samuels
Register Number: 61523-054
FCI Fort Dix
P.O. Box 2000
Joint Base MDL NJ 08640-0902

USDC SDNY
CLERK COURT
500 Pearl Street Fl 8
New York NY 10007-1316

C014

Crim Dud
SM

$3.39 US POSTAGE
8 OZ FIRST-CLASS PARCEL RATE
ZONE 6 NO SURCHARGE
Commercial

0625000795604
3 FROM 33156

stamps
endicia
09/16/2020

USPS TRACKING #

9400 1118 9956 4831 3557 32